3:24-mj-00055

DISTRICT OF OREGON, ss: Affidavit of Yonsoo Lee

# AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT AGAINST SELVA DELANO MUDALIAR

I, Yonsoo Lee, being duly sworn, do hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1. I am a certified police officer in the State of Oregon and am employed by the City of Tigard Police Department located in Washington County, Oregon. I have been employed in that capacity for over twenty-four years, and I have one-year prior law enforcement experience with the City of Gladstone Police Department where I was employed as a Reserve Police Officer. I am a peace officer of the State of Oregon within the meaning of Oregon Revised Statute 161.015, and I am authorized by law to conduct investigations, apply for and execute search warrants and arrest warrants, and to make arrests for violations of the Oregon Revised Statutes.

2. I am a sworn federal law enforcement agent of the United States having been deputized as a Special Deputy United States Marshal assigned as a Task Force Officer to the United States Department of Justice Federal Bureau of Investigation (FBI). I have been an FBI Task Force Officer for over eighteen years. I am empowered by law to conduct investigations and make arrests as set forth in Title 18, United States Code, Section 2516. As such, I am an "investigative or law enforcement officer" within the meaning of Title 18, United States Code, Section 2510(7).

3. I am currently assigned to the FBI's Violent Crimes, Human Trafficking, and Crimes Against Children squad, where I investigate crimes relating to violent incident crime, human trafficking, child exploitation, and child pornography, including violations of the

Trafficking Victims Protection Act that include Title 18, United States Code, Sections 1591 and 1594; and violations of the Mann Act that include Title 18, United States Code, Sections 2421-2424. I have over 3000 hours of continuing education and law enforcement training. I have received more than 500 hours of specialized training in investigating sexual violence, sexual exploitation, and human trafficking, and have participated in more than 100 investigations of sex trafficking and child sexual exploitation offenses, including many as the primary case agent. In addition, my formal education includes but is not limited to a Bachelor of Science degree in Economics and a Master of Science degree in Psychology.

4. This affidavit is submitted in support of an application for a criminal complaint charging SELVA DELANO MUDALIAR (hereinafter referred to as MUDALIAR), date of birth June XX, 1986, with violating the Mann Act, in violation of 18 U.S.C. § 2421, and with Sex Trafficking by Force, Fraud, or Coercion, in violation of 18 U.S.C. § 1591. Specifically, MUDALIAR transported Adult Victim 1 (AV1) from the State of Oregon to the State of Washington with the intent that AV1 engage in a commercial sex act, and with the knowledge that force and threats of force would be used to cause AV1 to engage in a commercial sex act.

5. The information contained in this affidavit is the result of my own investigation or has been provided to me by other law enforcement authorities whom I believe to be reliable. Since this affidavit is being submitted for the limited purpose of securing an arrest warrant, I have not included each and every fact known to me concerning this case. I have set forth only the facts that I believe necessary to establish probable cause for the issuance of this complaint.

/ / /

/ / /

## APPLICABLE LAW

6. Title 18, United States Code, Section 2421 generally makes it a crime for a person to knowingly transport any individual in interstate or foreign commerce, or in any Territory or Possession of the United States, with intent that such individual engage in prostitution, or in any sexual activity for which any person can be charged with a criminal offense, or to attempt to do so.

7. Title 18, United States Code, Section 1591 makes it a crime for a person acting in interstate commerce to recruit, entice, harbor, transport, provide, obtain, advertise, maintain, patronize, or solicit by any means a person, knowing that means of force, threats of force, fraud, coercion, or any combination of such means will be used to cause the person to engage in a commercial sex act.

## STATEMENT OF PROBABLE CAUSE

8. On December 3, 2021, Tigard Police Department patrol officers responded to a domestic violence complaint at an unknown apartment near the intersection of SW Hall Blvd and SW Garden Place in Tigard, Washington County, Oregon. AV1 reported to police dispatch that she had just been beaten up by a male subject who had told her not to tell police. AV1 further reported that she was walking north from the suspect's apartment and that she was bleeding. She reported that the suspect was going to kill her for calling the police; and further, that he had told her that he did not want to go back to jail. An officer with the Tigard Police Department was able to locate AV1 at a convenience store in the area. From speaking with AV1, the officer learned the following information:

/ / /

9. AV1 reported that she met the suspect, later identified by Oregon Driver's License as SELVA DELANO MUDALIAR, date of birth June XX, 1986, on an online dating app called Tinder and they had been dating each other for a few months. AV1 stated the two were drinking earlier in the day before arriving back at MUDALIAR's apartment approximately an hour before she called police. AV1 stated the assault began inside MUDALIAR's vehicle, which she described as a Volkswagen Passat while they were driving back to his apartment. She reported that while in the car, he began to call her names. AV1 stated MUDALIAR was drunk, which causes him to "snap" sometimes.

10. AV1 stated that without warning MUDALIAR suddenly hit the bottom of her nose with an open fist. AV1 stated this caused the back of her head to hit the Passat window. AV1 stated MUDALIAR then punched her on the back of her head twice with his fist.

11. Upon arriving at MUDALIAR's apartment, AV1 followed MUDALIAR into his kitchen where she attempted to apologize in an effort to end the assault. AV1 stated MUDALIAR did not verbally respond to her apologies. While in the kitchen AV1 stated MUDALIAR knocked her to the ground and put his hands around her neck and choked her. She also stated he stuck his right thumb in her mouth and down her throat after she yelled for help. AV1 stated the combination of the thumb down her throat and pressure left her unable to breathe and she lost consciousness.

12. AV1 stated that while his thumb was in her mouth she bit down on it, and that there should be bite marks on his right hand. AV1 stated MUDALIAR initially felt bad when he saw he had her blood on his hands, but became angry again when he saw that she bit him. AV1 stated several times that she believed she was going to die. AV1 stated MUDALIAR told

her that he'd kill her if she reported this to police and insulted her for not fighting back. She stated he told her that he hit her on the back of the head because it wouldn't bleed or leave a mark.

13. During his contact with AV1, the Tigard PD officer observed that she had dried blood on the top and bottom of her lips. AV1's bottom lip had a small circular puncture on the inside that had blood running from it, and it appeared to be swollen. Her left lower eyelid appeared swollen and there was a red laceration towards her nose. There appeared to be purple bruising on her upper left eyelid. There were red markings on the front and sides of AV1's neck, which appeared consistent with a hand mark. There were small discolored bruising spots on the top of AV1's right wrist. She had red marking and a small laceration on the inside of her left forearm. There was a small laceration with dried blood on the top of her left forearm. There was also reddish purple discoloration on the inside of her right forearm.

14. Paramedics responded to the scene and after triaging AV1, they determined that she needed to be transported to the hospital emergency room. AV1 was transported to a Hospital Emergency Department.

15. While the Tigard PD officer was interviewing AV1, other Tigard officers located MUDALIAR nearby driving his Volkswagen Passat. The Passat was stopped near 14255 SW 72nd Ave, Tigard, OR, where MUDALIAR was identified as the driver and owner of the vehicle. MUDALIAR was detained and placed into the back of a patrol car.

16. MUDALIAR was informed that he was being audio and video recorded. He was advised of his rights. MUDALIAR stated he understood his rights and was willing to speak with the officer. From speaking with MUDALIAR, the officer learned the following:

17. MUDALIAR was asked if he had been involved in an argument and he stated that he wasn't sure. When asked where he was coming from, he stated he was coming from his place. He did not know the exact address of his apartment, or the name of the complex. He then stated he requested an attorney to be present and no further questions regarding my investigation were asked. MUDALIAR was arrested for Assault II and Strangulation. While searching MUDALIAR the officer noticed a small laceration on the top of his right thumb. There was a layer of skin missing and there was fresh blood visible. There was also a small red puncture wound on the inside of MUDALIAR's right ring finger. These appeared consistent with AV1's statement that she had bit his right thumb while it was inside her mouth.

18. Subsequent investigation by the Tigard Police Department yielded that AV1 had initially been transported to Keizer Westside Hospital Emergency room where they discovered she had a broken hyoid bone in her throat. As a result, she was immediately transferred to the Oregon Health Sciences University which is one of the region's Level 1 Trauma Centers. AV1's throat had swollen to the point where there was concern it could compromise her airway.

19. The Washington County District Attorney's Office obtained a Grand Jury Indictment against MUDALIAR charging him with violating the following crimes:

1) ASSAULT IN THE SECOND DEGREE (2 COUNTS) Oregon Revised Statute 163.175
2) STRANGULATION (1 COUNT) Oregon Revised Statute 163.187(4)
3) KIDNAPPING IN THE FIRST DEGREE (4 COUNTS) Oregon Revised Statute 163.235
4) COERCION (1 COUNT) Oregon Revised Statute 163.275
5) UNLAWFUL USE OF A WEAPON (1 COUNT) Oregon Revised Statute 166.220
6) ASSAULT IN THE FOURTH DEGREE (2 COUNTS) Oregon Revised Statute 163.160(2)

Assault in the second degree, Strangulation, Kidnapping in the first degree, Coercion, and Unlawful use of a weapon are felonies under the laws of the State of Oregon.

/ / /

20. A jury trial on the above matter was scheduled for March 5, 2024. On February 23, 2024, there was a pre-trial conference scheduled. MUDALIAR failed to appear for the hearing date. On February 23, 2024, the Washington County Circuit Court issued a warrant for MUDALIAR's arrest.

21. United States Customs and Border Protection confirmed that MUDALIAR fled the United States on February 22, 2024. Investigators learned that, on the morning of February 21, 2024, MUDALIAR purchased a one-way airline ticket to Bangkok, Thailand. The full itinerary was PDX (Portland, Oregon), SEA (Seattle, Washington), INC (Incheon/Seoul, South Korea), BKK (Bangkok, Thailand). The flight manifest shows that MUDALIAR was checked in and on board after buying a last minute ticket on February 21, 2024 for the flight departing February 22, 2024.

22. Subsequent to MUDALIAR's flight, I was engaged by the Washington County District Attorney's Office and the Tigard Police Department to assist with investigating MUDALIAR's unlawful flight to avoid prosecution. Furthermore, I was informed by a detective with the Tigard Police Department that she had conducted a follow up interview of AV1, during which time she had asked AV1 about what had precipitated the assault on December 18, 2021. The detective reported that during this interview, AV1 told her that MUDALIAR had taken her to a hotel in Vancouver, Washington earlier on the night of the assault. AV1 further reported that MUDALIAR had taken her to the hotel with the expectation that she engage in prostitution with a customer who was staying at the hotel. The detective advised that she believed there were elements of sex trafficking in AV1's disclosure to her that merited follow up investigation.

23. On March 5, 2024 I contacted and spoke with AV1. When asked about the date which had previously been the subject of an assault investigation by the Tigard Police Department, AV1 reported that she and MUDALIAR had gone out to dinner at the Ringside in Portland. She reported that after dinner, they had gone to Scandal's, which is a club on Harvey Milk Blvd. She reported that while there, MUDALIAR played video poker. She reported that MUDALIAR ended up meeting a guy at the club who, after some conversation, wanted to purchase some cocaine from MUDALIAR. AV1 reported that MUDALIAR agreed to sell the guy some cocaine which he had stored in the glovebox of his car. AV1 reported that they walked over to the ATM so that the guy could withdraw some cash to buy the cocaine. She reported that while the guy was withdrawing cash from the ATM, MUDALIAR somehow got a look at the guy's account balance. She reported that MUDALIAR seemed to immediately get very excited and told her that he had over $50,000 dollars in his account. She reported that from that point on, MUDALIAR became very interested in the guy and told her to go and introduce herself to him. AV1 reported that in hindsight, it is very clear to her that MUDALIAR was planning on selling her to this guy for prostitution as soon as he saw how much money the guy had, but at the time she had been a little slow to catch on.

24. AV1 reported that in retrospect, MUDALIAR had said a number of things during the earlier part of their relationship that she should have paid closer attention to. She reported that for example, MUDALIAR had admitted to her that he had been arrested for promoting prostitution in the past. She reported however, that MUDALIAR had explained it as being a false allegation where a girl that he knew had made up lies against him. She further reported that about a week prior to the incident she was describing, MUDALIAR had been upset with her

for some reason or other and texted her an angry message about her being "out of pocket." AV1 reported that she had no idea what that meant at the time, but that her friend who had previously been a prosecutor later explained to her that was street slang associated with sex trafficking. AV1 reported that on another occasion, while they were discussing different places where they had lived, MUDALIAR commented that one of the cities that she had lived in was well known for its brothels. She reported that within the context of this conversation, he somehow brought up something about how she needed a madam in her life. AV1 reported that MUDALIAR then went on to remark that he could act as her madam but that she would "owe him collateral."

25. AV1 recalled that the prostitution customer had told her and MUDALIAR that he was in town for business for the week. She described the customer as an older white male adult. She reported that he was tallish at nearly 6'0 tall with a medium build. She reported that he had gray hair and looked clean cut. Her recollection was that he had been wearing blue jeans and a button down shirt. She further recalled the customer telling her that he had gotten into town the previous evening which, based on the date of incident, would have put his arrival in town at or about December 1, 2021. She reported that the customer had told them that he had taken an Uber to the club so he didn't have a car. She reported that the three of them got into MUDALIAR's Volkswagen Pasat and drove to the customer's hotel in Vancouver, Washington. When asked how she knew it was in Vancouver, AV1 reported that she definitively recalls going over the big bridge into Washington State.

26. AV1 reported that upon arriving at the hotel, she observed it to be a typical mid-tier hotel with 3-4 levels. She reported that it was nicer than say a Motel 6, but not super nice. She explained that it was like a Quality Inn or LaQuinta type of place. She reported that the

customer's room was on the ground floor close to one of the exterior doors. She reported that upon entering the room, she observed it to be a room with two queen beds. She reported the bathroom and shower were on the right as they entered the room. She reported there was no kitchen or kitchenette in the room. She reported that she has no idea how to get there, but that she would likely recognize it if she saw it again.

27. AV1 reported that once they got to the hotel room, the customer did some of the cocaine that he had purchased from MUDALIAR. She reported that after that, the two men began talking about prostituting AV1 to the customer. She reported that they didn't even hide it and began openly negotiating right in front of her. She further stated that MUDALIAR didn't even hide the fact that he was a pimp and told her customer that she was "his girl" and he was AV1's pimp. She recalled MUDALIAR asking the customer, "So you want her for the whole week?" AV1 reported that the customer said "Yes," at which point MUDALIAR had told the customer that it would cost him $1500. She reported that they explicitly discussed the fact that for $1500, that "includes everything" and she was expected to engage in sexual intercourse with the man.

28. AV1 reported that for some reason unknown to her, MUDALIAR continued to linger in the room. She reported that eventually, the customer actually told MUDALIAR that he was going to have to leave. She reported that during this time, MUDALIAR started getting upset with her for some reason and the tenor of how he was interacting with her changed, with him using increasingly "rough" language with AV1. AV1 reported that the customer "realized that I [AV1] was going to get beat" and told MUDALIAR, "You gotta get the fuck out of here." AV1 reported that MUDALIAR eventually left the room to go out to his car.

29. AV1 reported that once MUDALIAR left the room, the customer told her that he wasn't interested in having sex with her at that time. She reported that the customer told her that it was his opinion that MUDALIAR was "fixin' to beat" her. AV1 reported that the customer suggested to her a plan to avoid her getting beaten up by MUDALIAR. The customer told AV1 that he would provide her with an endorsed blank check that she could give to MUDALIAR. The customer instructed AV1 to tell MUDALIAR that he could fill out the check for whatever amount would appease him and compensate him for his time. AV1 reported that the customer further advised that this should give her enough time to get away from MUDALIAR, and that the customer would cancel payment on the check the following day. The customer gave AV1 his phone number and told her that she could call him once she was able to get away from MUDALIAR and they could negotiate their own deal in which AV1 would be able to keep the proceeds.

30. AV1 reported that this plan did not work. She reported that as soon as she got out to the car and handed the check to MUDALIAR, he crumpled it up and tossed it away. She reported that he got extremely angry and began screaming at her, "You were supposed to fuck him all week….you were supposed to fuck him and give me fucking cash." She reported that during this time MUDALIAR began beating her while in the car as previously reported to Tigard Police on the night of incident. She reported that while beating her, MUDALIAR had repeatedly yelled at her that she was supposed to "fuck" the customer and get him "fucking cash."

31. AV1 reported that during the drive from the hotel in Vancouver, Washington to MUDALIAR's apartment in Tigard, Oregon, and throughout the physical assault that occurred

both during the drive and after arriving at the hotel, MUDALIAR repeatedly told her not to tell anyone about the prostitution or the assault. She reported that he repeatedly told her that he would kill her if she told anyone. She recalled that throughout the assault (previously reported to Tigard Police), she had though she was going to be killed and used any tactics she could think of to de-escalate MUDALIAR, including telling him that she loved him, promising him that she wouldn't ever talk about the prostitution, and even that he would risk going to prison if he didn't let her go. AV1 recalled MUDALIAR threatening her with the fact that when he had gone to prison for the prior promoting prostitution charge, he had sent his family after the girl for "lying" about him.

32. On March 12, 2024, the Washington County District Attorney's Office provided me with a copy of AV1's medical records from Kaiser Westside and Oregon Health Sciences University. I reviewed the records and observed them to confirm that AV1 had presented at Kaiser Westside on December 3, 2021, where she was found to have a broken hyoid bone, as well as a laceration to her lower frenulum. She was transferred to the Oregon Health Sciences University for a trauma consult. OHSU confirmed the above findings as well as numerous abrasions, contusions, and swelling to her head and body.

33. On March 23, 2024 I caused a check of MUDALIAR's criminal history. MUDALIAR is a registered sex offender who is out of compliance. I observed that MUDALIAR had a four-cycle CCH in the State of Oregon. MUDALIAR's first arrest in Oregon in 2015 was for Involuntary Servitude in the first degree, as well as domestic assault charges, intimidation charges, and coercion. MUDALIAR's second Oregon arrest in 2015 included promoting prostitution charges. MUDALIAR's third arrest was the result of the

kidnapping, assault, and strangulation conduct that is the basis of the instant investigation. In addition to the charges in Oregon, MUDALIAR has an extensive criminal history with charges in the State of Washington and State of Nevada in addition to the ones in Oregon. I observed that MUDALIAR had been arrested by the Bellevue Police Department in Washington state for Promoting Prostitution. I observed that MUDALIAR had been arrested by the Reno Police Department in Nevada for Pandering. MUDALIAR has numerous arrests for domestic violence related charges as well as multiple arrests for robbery.

34. Based on the foregoing, I believe there is probable cause to conclude that MUDALIAR has committed transportation in violation of the Mann Act, 18 U.S.C. § 2421, and sex trafficking by force, fraud, or coercion in violation of 18 U.S.C. § 1591, by transporting AV1 from the State of Oregon to the State of Washington, knowing that force would be used to cause AV1 to engage in a commercial sex act.

35. In consideration of the foregoing, I respectfully request that this court issue a criminal complaint and arrest warrant for SELVA DELANO MUDALIAR.

/ / /

/ / /

/ / /

36. Prior to being submitted to the Court, this affidavit, the accompanying complaint and the arrest warrant were all reviewed by Assistant United States Attorney (AUSA) Mira Chernick, and AUSA Chernick advised me that in her opinion the affidavit and complaint are legally and factually sufficient to establish probable cause to support the issuance of the requested criminal complaint and arrest warrant.

*/s/ By phone pursuant to Fed. R. Crim. P. 4.1*
YONSOO LEE
FBI TASK FORCE OFFICER

Sworn before me in accordance with the requirements of Fed. R. Crim. P. 4.1 at 9:40 am. on March 26 2024.

HONORABLE JEFFREY ARMISTEAD
United States Magistrate Judge